**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Amethyst Deasy,

         Plaintiff,

   v.

Northern Arizona Healthcare Corporation,

         Defendant.

No. CV-22-08057-PCT-JJT

**ORDER**

At issue is Defendant Northern Arizona Healthcare Corporation's Motion for Summary Judgment (Docs. 69, 79, "MSJ"), to which Plaintiff Amethyst Deasy filed a Response (Docs. 104, 105 "Resp.") and Defendant filed a Reply (Docs. 111, 113). The Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f).

## I.   BACKGROUND

Plaintiff began working for Defendant as a registered nurse in 2013 and became a charge nurse in 2017.[1] During most of her employment, Plaintiff worked in the pediatric intensive care unit and reported to her manager, Colleen Little.

The events germane to Plaintiff's claims began in 2015, when Plaintiff's coworker, Nicholas Londeree, began calling Plaintiff "Amway Global." (Doc. 98, "PCSOF" ¶ 20.) Plaintiff believed the nickname to be a derogatory reference to her weight, as she was pregnant with twins at the time. (PCSOF ¶ 20.) Plaintiff raised this issue to Ms. Little, but Mr. Londeree continued to use the nickname about twice a week. (PCSOF ¶ 20.)

---

[1] A charge nurse oversees the unit operations for a shift. (Doc. 98-2 at 87.)

Plaintiff also asserts that in early 2017, Mr. Londeree stated to Plaintiff, "So you could draw a picture of my dick."[2] (Doc. 98-1, Ex. 1, "Deasy Dep." at 33:3–4.) Plaintiff and a coworker reported this comment to Ms. Little shortly afterward, (PCSOF ¶ 7.) and in October 2017, Ms. Little called Mr. Londeree into her office to warn him that such comments were inappropriate. (Doc. 70-2, Ex. 6, "Little Dep." at 39:19–41:25.) Ms. Little also suggested that apologizing would be a good idea. (Little Dep. at 40:11–14.) Mr. Londeree claims to have subsequently done so, but according to Plaintiff, he instead asked her to step into a private area with him and stated, "[Ms. Little] told me that you reported this comment, and so I just won't date any of your friends anymore." (Deasy Dep. at 34:8–11.) The next year, Ms. Little wrote in Mr. Londeree's performance review that he should be aware of "perceived inappropriate comments" he made toward colleagues, (Doc. 98-2, Ex. 21) but she otherwise did not reprimand Mr. Londeree for the 2017 remark.

Plaintiff further claims that throughout 2018 and 2019, Mr. Londeree made repeated sexual references either to or in front of Plaintiff. He would sometimes discuss how his girlfriend "performed" sexually or describe others as "sexy," (PCSOF ¶ 34.) and he had frequent conversations with a coworker, Gretchen Lerch, "regarding explicit sex." (Deasy Dep. at 57:2–14.) In one such conversation with Ms. Lerch, he discussed a past relationship and stated that he "had hot sex." (Londeree Dep. at 24:22–25.) In another, he made a "that's what she said" joke with sexual undertones. (Doc. 98-1, Ex. 5, "Deasy Dec." ¶ 5(b).) A coworker also heard Mr. Londeree "hint at" sleeping with women he dated, (Doc. 98-2, Ex. 10 at NAH_000430) and Ms. Lerch admitted to once calling someone a "spicy doctor and having a crush on them." (Doc. 98-2, Ex. 16 at NAH_469.) Ms. Little confirmed that she too had heard Mr. Londeree and Ms. Lerch use sexual innuendoes. (Little Dep. at 103:8–17.) In 2018, Plaintiff complained to Ms. Little about Mr. Londeree's actions again.

---

[2] Plaintiff does not offer the context of this statement, and the exact language is disputed, but according to Mr. Londeree, he overheard Plaintiff and a coworker talking about his sex life with a friend of Plaintiff's that he was dating at the time, and when Plaintiff said to him, "I already know way too much about your body," he responded, "Could you draw me a picture?" (Doc. 70-2, Ex. 5, "Londeree Dep." at 26:8–21.)

(Doc. 98-2, Ex. 9.) Ms. Little spoke with Mr. Londeree but told him that he was performing well and did not reprimand him. (Doc. 98-1, Ex. 8 at NAH_001173–74.)

Aside from sexual comments, Plaintiff also contends that Mr. Londeree would "undermine women." (Doc. 98-1, Ex. 6, "Monaghan Dec." ¶ 8.) She asserts that Mr. Londeree acted as though he knew medicine better than the female nurses, questioned women in authority, and behaved arrogantly towards women, particularly Plaintiff. (Monaghan Dec. ¶ 8.) Plaintiff also avers that Mr. Londeree would tell other coworkers not to listen to her as a charge nurse because she did not know how to perform her job, and he would question the decisions she made. (Deasy Dec. ¶ 3(a)–(b).) Sometimes Mr. Londeree would stand "over [Plaintiff's] shoulder" and criticize her work. (Deasy Dec. ¶ 3(c).) Plaintiff estimates that Mr. Londeree undermined her authority in some way nearly every time they worked together, which was about twice a week. (Deasy Dec. ¶ 3(f).) Plaintiff adds that Mr. Londeree's "behavioral issues" predate her time working for Defendant, and Defendant has known about Mr. Londeree's attitude toward women since 2014 when other coworkers made several complaints about him. (Doc. 98-2, Ex. 18.)

Because Defendant had not rectified Mr. Londeree's actions despite Plaintiff's complaints, Plaintiff filed an anonymous report with the human resources department ("HR") in February 2019. (Deasy Dep. at 66:22–67:16.) The report laid out many of the aforementioned incidents as well as other "inappropriate and unprofessional" interactions that Mr. Londeree had with coworkers and patients. (Doc. 98-2, Ex. 10.) After investigating the report, HR found only some of the allegations to be true and noted that Ms. Little had addressed those incidents already. (Doc. 70-3, Ex. 25.) HR ultimately recommended only a short training session on civil treatment. (Doc. 70-3, Ex. 25.)

Plaintiff then alleges that after she filed the report, Defendant began retaliating against her. First, Ms. Little blamed Plaintiff for leaving out notes with criticism of other nurses for everyone to see. (Deasy Dec. ¶ 6(a).) Although Ms. Little later admitted that another nurse had left the notes out, Plaintiff was blamed for the incident multiple times, including in a performance review. (Deasy Dec. ¶ 6(a).) Ms. Little also demanded that

Plaintiff stop complaining about or criticizing Mr. Londeree. (PCSOF ¶ 40.) Shortly thereafter, Ms. Little began requiring that Plaintiff seek preapproval to work overtime hours, while other nurses, including Mr. Londeree, commonly worked overtime without preapproval. (PCSOF ¶ 30.)

In March 2019, Plaintiff filed a complaint with HR expressing concerns that Mr. Londeree's behavior had not changed and she was being targeted for complaining about it. (Doc. 70-3, Ex. 37.) HR investigated, found all of Plaintiff's allegations to be unsubstantiated, and planned a meeting with Ms. Little and Plaintiff to establish expectations moving forward. (Doc. 70-3, Ex. 37.) When they discussed Mr. Londeree's behavior, Plaintiff was asked if she was "willing to let it go" and "move forward . . . in a way that allows [her] to get over it." (Def. Ex. 11 at 46:34–58.) In May 2019, Plaintiff alleged further retaliation in a follow up to her February report. (Doc. 98-2, Ex. 15.)

In July 2019, Plaintiff voluntarily transferred out of the pediatric department "because of management and HR's relentless scrutiny about [her] complaints of [Mr. Londeree's] sex discrimination and sex harassment." (Deasy Dec. ¶ 6(d).) While Plaintiff was in the process of transferring, HR met with her once again and "accused [her] of complaining about [Mr. Londeree] too much." (Deasy Dec. ¶ 6(e).) In August 2019, HR relayed to Plaintiff's new management that several months prior, Ms. Lerch had filed a complaint against Plaintiff. In September 2019, Ms. Little issued a performance review of Plaintiff highlighting a colleague's statement that Plaintiff complained too frequently. (Doc. 98-2, Ex. 14 at NAH_000931.) Finally, in May 2020, Plaintiff resigned from Defendant in part because Ms. Little and HR continued to retaliate against her despite her transfer to a new department.[3] (Deasy Dec. ¶ 7.)

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 5, 2020, and later brought this suit alleging sex discrimination and retaliation in violation of Title VII. (Doc. 1, "Compl." at 21–26.) Defendant now moves for summary judgment on both claims and with respect to several remedies.

---

[3] Plaintiff also resigned in part for reasons related to the demands of her new position. (Deasy Dec. ¶ 7.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

. . . .

. . . .

1 **III.   ANALYSIS**

2     **A.   Title VII Sex Discrimination**

3        Plaintiff first brings a claim of sex discrimination under Title VII, 42 U.S.C.

4 § 2000e-2(a)(1), solely on a sexual harassment hostile work environment theory. (Compl.

5 at 21–22; Resp. at 10.) To state a Title VII claim of sexual harassment based on a hostile

6 work environment, Plaintiff must produce evidence sufficient to show that: (1) she was

7 subjected to verbal or physical conduct of a harassing nature; (2) this conduct was

8 unwelcome; and (3) the conduct was sufficiently severe or pervasive as to alter the

9 conditions of her employment and create an abusive working environment. *Pavon v. Swift*

10 *Transp. Co.*, 192 F.3d 902, 908 (9th Cir. 1999). Regarding the third element, the conduct

11 must be severe or pervasive enough to both subjectively and objectively create an abusive

12 environment. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). There is no

13 exact test to determine whether the environment is objectively abusive, but the Court must

14 look at "all the circumstances" and should consider factors such as the frequency and

15 severity of the conduct. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22–23 (1993). "The

16 required level of severity or seriousness 'varies inversely with the pervasiveness or

17 frequency of the conduct.'" *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020)

18 (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)). Although

19 an employer is liable under Title VII only for its own actions, "it is well established that an

20 employer can create a hostile work environment by failing to take immediate and corrective

21 action in response to a coworker's or third party's sexual harassment . . . the employer

22 knew or should have known about." *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th

23 Cir. 2021). The Ninth Circuit has also "emphasized the importance of zealously guarding

24 an employee's right to a full trial" in the context of employment discrimination, because

25 "discrimination claims are frequently difficult to prove without a full airing of the evidence

26 and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv.*

27 *Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

28

Plaintiff founds her hostile work environment claim on the allegations that Mr. Londeree called her "Amway Global" repeatedly for years, stated that Plaintiff "could draw a picture of [his] dick," frequently discussed his sex life or made sexual innuendos, and constantly undermined her position as a charge nurse by criticizing her and telling others that she did not know how to do her job. (Compl. at 21–22; Resp. at 10.)

Defendant first argues that Plaintiff's claims are without merit because Defendant investigated Plaintiff's complaints and found them to be unsubstantiated. (MSJ at 11.) Defendant's own investigation of the alleged harassment, however, fails to show that no genuine dispute of material fact exists. In fact, it shows Defendant *disputes* Plaintiff's factual allegations that harassment occurred and continued. Defendant's internal finding that there was no harassment cannot support summary judgment, especially when Plaintiff's position is that "[Defendant's] failure to stop [Mr. Londeree's] continued harassment subjects it to liability." (Reply at 11.) *See also Fried*, 18 F.4th at 651 (concluding that an employer may be held liable for sexual harassment "where the employer's response to known harassment has subjected the employee to further harassment").

Defendant also challenges Plaintiff's claim that Mr. Londeree repeatedly called her "Amway Global," arguing that it lacks merit and does not give rise to a hostile work environment. (MSJ at 11.) Defendant asserts that this claim is "disingenuous," and it is "unsupported by the record" that the nickname referred to her weight. (MSJ at 9.) However, testimony from Plaintiff's deposition, Ms. Little's deposition, and Mr. Londeree's deposition all support Plaintiff's claim that Mr. Londeree used the nickname. (Deasy Dep. at 99:21–100:15; Little Dep. at 113:21–114:9; Londeree Dep. at 38:16–21.) And although Mr. Londeree claims that he did not intend it to be a reference to Plaintiff's weight or pregnancy, his intent is not dispositive. *See Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) (explaining that perpetrators may commit "sexual harassment even when [they] do not realize that their conduct creates a hostile work environment"). Plaintiff stated in her deposition that she understood the nickname—particularly "Global"—to be a derogatory

comment on her weight or pregnancy, (Deasy Dep. at 176:1–177:23) and the Court finds that this evidence suffices to contradict Defendant's assertion that Mr. Londeree did not use the nickname in a disparaging manner.

Defendant next states that "the *only* arguably inappropriate comment that Plaintiff heard Mr. Londeree make" was when he said she "could draw a picture of [his] dick," and Defendant argues that as a matter of law, this comment alone cannot sustain a sex harassment claim. (Reply at 7.) To reach this conclusion, Defendant works around Plaintiff's allegations of other harassing conduct—the derogatory nicknaming, the frequent overtly sexual conversations, the constant criticism of Plaintiff's work—by pointing to record evidence that controverts Plaintiff's allegations and asserting that there is "no evidence" in support of those events. (Reply at 2–6.) But Plaintiff identifies testimonial and documentary evidence that Mr. Londeree called her "Amway Global" about twice a week, (Deasy Dep. at 99:21–100:15, 176:1–177:23) had sexual conversations or made sexual comments and jokes, (Londeree Dep. at 24:22–25; Deasy Dep. at 57:2–14; Deasy Dec. ¶ 5(b); Little Dep. at 103:8–17; Doc. 98-2, Ex. 9) and frequently criticized her work and undermined her position of authority (Monaghan Dec. ¶ 8; Deasy Dec. ¶ 3(a)–(c), (f)). Although much of Plaintiff's evidence is self-serving testimony, and some of it is uncorroborated, "declaration and deposition testimony, albeit uncorroborated and self-serving, [may be] sufficient to establish a genuine dispute of material fact" in a discrimination claim. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 498 (9th Cir. 2015). Defendant therefore cannot show that there is "no evidence" to support Plaintiff's allegations, and Defendant's controverting evidence only creates of a genuine dispute of fact.

These disputed facts are only material, however, if they "might affect the outcome of the suit under governing [substantive] law." *Anderson*, 477 U.S. at 248. And Defendant argues that even if evidence exists to support Plaintiff's factual claims, her allegations do not rise to the level of a hostile work environment. (Reply at 7.) For support, Defendant likens this case to *Kortan v. California Youth Authority*, in which the Ninth Circuit affirmed

summary judgment for the defendant when a supervisor made a "flurry" of derogatory comments, mostly on one day, which included referring to a former female superintendent as a "castrating bitch," "madonna," and "regina." 217 F.3d 1104, 1110 (9th Cir. 2000). But in concluding that the conduct was not frequent or severe enough to constitute actionable harassment, the Ninth Circuit considered the totality of the circumstances, "including the fact that [the supervisor's] conduct was concentrated on one occasion." *Id.* at 1111. Unlike the sharp but isolated comments in *Kortan*, the conduct alleged here was milder but far more frequent and consistent. *Kortan* is thus an ill-suited analog because "[t]he required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *See Christian*, 984 F.3d at 809 (quoting *Nichols*, 256 F.3d at 87).

A more comparable case is *Draper v. Coeur Rochester, Inc.*, in which a female worker alleged that over the course of two years, a coworker called her "beautiful" or "gorgeous" rather than by name, discussed his sexual fantasies with her, commented on her "ass," and asked if she needed help changing clothes. 147 F.3d 1104, 1106 (9th Cir. 1998). The Ninth Circuit recognized that, "[a]s in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect." *Id.* at 1108. Taking into account the totality of the circumstances, the Ninth Circuit concluded that the plaintiff had raised a genuine dispute of material fact. *Id.*

Like the plaintiff in *Draper*, Plaintiff alleges steady and continuing harassment here. She estimated that Mr. Londeree called her "Amway Global" and undermined her authority "nearly every time [they] worked together," which was about twice a week over the course of several years. (Deasy Dec. ¶¶ 3(f), 5(c).) Meanwhile, Mr. Londeree would also openly and frequently discuss his sex life, including a conversation in which he stated that he "had hot sex." (Londeree Dep. at 24:22–25; Deasy Dep. at 57:2–14.) Plaintiff also alleges intermittent, individual instances of harassment, such as when Mr. Londeree made a "that's what she said" joke with sexual undertones and stated, "So you could draw a picture of my

dick." (Deasy Dep. at 33:3–4; Deasy Dec. ¶ 5(b).) As in *Draper*, it is not the severity of any one alleged incident but the combination of them all, together with Defendant's alleged inability to prevent the harassment, that creates a genuine factual dispute as to whether the conduct was "sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment." *See Pavon*, 192 F.3d at 908. The Ninth Circuit has often held "that it should not take much for plaintiff in a discrimination case to overcome a summary judgment motion . . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder." *Nigro*, 784 F.3d at 499. Consistent with that principle, the Court will allow a factfinder to resolve the inquiry here.[4]

For similar reasons, the Court is also unpersuaded by Defendant's assertion that Plaintiff's claim is untimely. Defendant argues that the only actionable harassment was an isolated comment in 2017, well outside the three hundred day window prior to Plaintiff's February 5, 2020 EEOC charge. (MSJ at 9; Reply at 12.) But for a hostile work environment "charge to be timely, the employee need only file a charge within . . . 300 days of *any* act that is part of the hostile work environment." *Morgan*, 536 U.S. at 118 (emphasis added); *see also* 42 U.S.C. § 2000e-5(e)(1). Thus, having established that Plaintiff's hostile work environment claim is premised on, and supported by evidence of, events that occurred continuously at least until she transferred departments in July 2019, the Court finds that Plaintiff's claims are timely.

Defendant has failed to show that there is no genuine dispute of material fact as to Plaintiff's hostile work environment claim, and the Court will deny Defendant's Motion on that ground.

---

[4] Defendant also argues that Plaintiff cannot establish her "constructive discharge claim." (MSJ at 12.) Plaintiff does not bring a constructive discharge "claim," but rather alleges that she was constructively discharged as part of her Title VII claims. (Compl. ¶¶ 1–2.) Because "[a] constructive discharge occurs when a person quits his job under circumstances in which a *reasonable person* would feel that the conditions of employment have become intolerable," *Lawson*, 296 F.3d 799, 805 (9th Cir. 2002) (quoting *Draper*, 147 F.3d at 1110), the same evidence that supports Plaintiff's hostile work environment claim may support her allegation of a constructive discharge.

**B.     Title VII Retaliation**

Plaintiff also brings a claim of retaliation under Title VII, 42 U.S.C. § 2000e-3(a), alleging that Defendant retaliated against her by issuing negative performance evaluations, demanding she stop complaining about Mr. Londeree, falsely accusing her of leaving out negative notes, and "accusing her of working too many (approved) hours and cutting her hours." (Compl. at 23–24; Resp. at 12.) To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* And if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretext for a discriminatory motive. *Id.*

Defendant argues that Plaintiff cannot establish a *prima facie* retaliation case in part because she cannot show that she suffered an adverse employment action. (MSJ at 16.) Title VII's retaliation provision protects individuals only "from retaliation that produces an injury or harm," therefore "[n]ot every employment decision amounts to an adverse employment action," and "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

Plaintiff asserts several alleged adverse employment actions here. (Resp. at 13.) She states that in response to her 2017 complaint, Defendant "allowed [Mr. Londeree] to confront her in a closed room and gaslight her." (Resp. at 13.) She further alleges that in response to her February 2019 complaints, Defendant repeatedly and wrongfully blamed her for leaving out critical notes about other staff members. (Resp. at 13.) Plaintiff adds that Defendant began making negative performance review comments only after she began complaining about Mr. Londeree's behavior. (Resp. at 13–14.) Plaintiff also states that

Defendant "demand[ed] she stop making any complaints of sex harassment against [Mr. Londeree.]" (Resp. at 14.) And Plaintiff alleges that in response to her latest complaints, Defendant required her to obtain approval before working overtime, which it had not required prior to her complaints. (Resp. at 14.)

First, Plaintiff is correct that there is evidence of Mr. Londeree asking Plaintiff to step into a private area with him and stating, "[Ms. Little] told me that you reported this comment, and so I just won't date any of your friends anymore." (Deasy Dep. at 34:8–11.) However, contrary to Plaintiff's assertion, there is no evidence that Defendant "allowed" this to happen. Plaintiff presents no evidence that anyone other than Plaintiff or Mr. Londeree would have had any reason to know of this interaction. Thus, this incident cannot serve as evidence of Defendant's retaliation.

Second, although there is evidence that Ms. Little wrongfully blamed Plaintiff for leaving notes out for others to see, (Deasy Dec. ¶ 6(a)) such an inconsequential act cannot constitute actionable retaliation because it would not deter a reasonable employee from complaining about violations. *See Brooks*, 229 F.3d at 928. There is simply not an adequately discernable connection between Defendant's alleged reaction and Plaintiff's protected act.

Third, Plaintiff points to the "negative" performance review comments she received after she filed complaints about Mr. Londeree. In 2018, Plaintiff's review indicated that she met or exceeded expectations in all but one evaluated category (her "Finance Goal"), and she received several positive comments highlighting her work. (Doc. 98-2, Ex. 14 at NAH_000313–22.) Plaintiff received an overall score of 2.53[5] out of 3.00, indicating that she "meets expectations." (Doc. 98-2, Ex. 14 at NAH_000322.) In 2019, after she had filed complaints about Mr. Londeree, Plaintiff's review indicated that she met or exceeded expectations in all but one evaluated category, and she again received several positive comments. (Doc. 98-2, Ex. 14 at NAH_000929–38.) This time, the only category in which she "[did] not meet expectations" was "Communication." (Doc. 98-2, Ex. 14 at

---

[5] The overall score does not appear in the performance review exhibit but is readily calculatable from the component scores appearing in each section.

NAH_000930.) The associated comment noted that Plaintiff "can be overly critical," and it added that a colleague stated Plaintiff "complain[ed] too frequently." (Doc. 98-2, Ex. 14 at NAH_000931.) Plaintiff received an overall score of 2.36 out of 3.00. (Doc. 98-2, Ex. 14 at NAH_000938.)

Although Plaintiff's 2019 review indicated a slight decrease in performance score and included one negative comment, it can hardly be considered a negative performance review overall. Plaintiff met or exceeded expectations in all but one category and received praise for good work in several areas—just as she had in reviews prior to her complaints. Moreover, there is no evidence that the performance review or the negative comment were disseminated or that they caused Plaintiff to be demoted, stripped of work responsibilities, handed different or more burdensome work, fired, suspended, or denied raises or benefits. *Cf. Kortan*, 217 F.3d at 1112–13 (concluding plaintiff could not show that a negative evaluation was discriminatory, retaliatory, or "intolerable" when it was not disseminated and did not cause some additional tangible employment harm). The performance review is thus not evidence of actionable retaliation.

Fourth, Plaintiff claims Defendant "demand[ed] she stop making any complaints of sex harassment against [Mr. Londeree.]" (Resp. at 14.) To prove this point, Plaintiff cites evidence that Ms. Little met with Plaintiff and told her to stop complaining about Mr. Londeree. (Doc. 70-2, Ex. 15 at NAH_000418.) And in a follow up email, Ms. Little stated that their conversation had yielded an agreement that "[c]riticism of [Mr. Londeree] and other negative conversations regarding [Mr. Londeree] will stop immediately," and Plaintiff would "[l]et [Mr. Londeree's] actions speak for themselves and allow others to form their own opinions." The email proceeded to state, "If you have a concern with a co-worker it should be handled in a respectful and professional manner." (70-3, Ex. 16 at NAH_000355.) In a subsequent audio recorded conversation between Plaintiff, Ms. Little, and an HR representative, Plaintiff said that she understood Ms. Little's statements to mean: "I expect you not to talk about him with your coworkers anymore." (Def. Ex. 11 at 8:14–30.) Ms. Little clarified that she "didn't want [Plaintiff] to criticize [Mr. Londeree]

in front of other people and have negative comments about him in front of other people."
(Def. Ex. 11 at 8:37–45.) When Plaintiff stated, "Yeah, but I can still give constructive
feedback to all of my coworkers. . . . And he is not . . . taken out of that," Ms. Little
responded, "Absolutely. Absolutely." (Def. Ex. 11 at 8:46–56.) Later in the conversation,
Plaintiff was asked if she was "willing to let it go" and "move forward . . . in a way that
allows [her] to get over it." (Def. Ex. 11 at 46:34–58.) When Plaintiff explained that she
continued to take the matter to HR because she "ha[s] to be able to advocate for [her]self,"
Ms. Little responded, "Absolutely. And you can. . . . And I want you to know that these
things were addressed." (Def. Ex. 11 at 49:42–51:00.)

Based on these interactions, and contrary to Plaintiff's assertion, there is no
evidence from which a jury could find that Defendant "demand[ed] [Plaintiff] stop making
any complaints of sex harassment against [Mr. Londeree]." Although there is evidence that
Defendant sought to end the general criticism Plaintiff shared with coworkers about
Mr. Londeree, there is no evidence that Defendant asked Plaintiff to cease her sexual
harassment complaints or that Defendant otherwise prohibited Plaintiff from raising
complaints internally to HR. In fact, when Plaintiff explained why she wanted to use HR
as an avenue for recourse, Ms. Little stated, "Absolutely. And you can," indicating that
Plaintiff was not foreclosed from complaining to HR in the future. And Plaintiff admitted
that she understood Ms. Little's demands as only an expectation "not to talk about
[Mr. Londeree] with [her] coworkers anymore." The evidence thus shows only
Defendant's attempts to ease inter-employee workplace relations without prohibiting
Plaintiff from pursuing relief through HR, and Plaintiff stated that she understood
Ms. Little's demands as such. Accordingly, Defendants actions would not "deter
reasonable employees from complaining about Title VII violations" and are thus not
actionable harassment. *See Brooks*, 229 F.3d at 928.

Finally, Plaintiff alleges that Defendant retaliated against her by suddenly requiring
her to obtain approval before working overtime, and these "retaliatory restrictions on
obtaining overtime pay led to a decrease in her income." (Resp. at 14.) For support, Plaintiff

cites only her pay records and her statement that her "ability to get overtime hours specifically was reduced." (Doc. 98-3, Ex. 26; Deasy Dep. at 169:1–2.) Although a reduction in pay is an adverse employment action, *Ray*, 217 F.3d at 1243–44, Plaintiff has not shown a reduction in pay here. Plaintiff claims that she was required to obtain approval for overtime hours, but Plaintiff cites no evidence that she *actually sought approval* and was denied. Relatedly, although Plaintiff states that the restriction decreased her pay, there is no evidence of what her pay would have been had the restriction not existed compared to what her pay previously was. Plaintiff therefore fails to show that the preapproval requirement reduced her pay such that it was an adverse employment action.[6] Without a showing that she suffered a reduction in pay, the requirement to obtain approval for overtime hours, alone, would not deter a reasonable employee from raising Title VII issues. *See Brooks*, 229 F.3d at 928. The preapproval requirement is therefore not actionable harassment.

Ultimately, each of Plaintiff's arguments is unavailing, as there is no genuine dispute of material fact as to whether she suffered an adverse employment action. And without an adverse employment action, Plaintiff cannot establish a *prima facie* case of retaliation. Therefore, the Court will grant Defendant's Motion as to Plaintiff's retaliation claim.

### C.    Damages

Lastly, Defendant argues that Plaintiff cannot prove her damages. (MSJ at 17.) Plaintiff seeks compensatory damages—which she specifies in her Response are emotional damages—and punitive damages.[7] (Compl. ¶ 89(C)–(E); Resp. at 8 & n.1.)

Defendant first argues that Plaintiff cannot prove her emotional damages because there is "no evidence of work-related emotional distress." (MSJ at 17.) But Plaintiff proffers medical records ██████████████, which include many mentions of the

---

[6] For the same reasons, Plaintiff is unable to prove her damages on this claim.

[7] Plaintiff also originally sought back pay and front pay damages in her Complaint but later conceded in responses to interrogatories and requests for production that she is not pursuing those damages regarding her separation from Defendant. The Court takes judicial notice of Plaintiff's responses. (Doc 116-1 at 6, 43–44.)

emotional distress Plaintiff endured at her job. (Doc. 107.) For example, the records indicate that Plaintiff experienced a "stressful work environment" and felt "anxiety, hopelessness, and distress due to sexual harassment" at work. (Doc. 107 at Deasy 001893, 001898.) Still, Defendant points out that ████████████████████ consistently diagnosed Plaintiff with ████████████████████ rather than some kind of work-related stress, and thus argues that Plaintiff's medical records are not evidence of emotional distress attributable to the alleged sexual harassment. The Court disagrees. Plaintiff need not produce a diagnosis or other "objective evidence" of emotional distress to support an award of emotional damages. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000)). The discussion of Plaintiff's work-related stress and anxiety throughout her medical records is thus sufficient evidence of emotional distress to create a triable issue. The Court will therefore deny Plaintiff's Motion as to compensatory damages.

Defendant also argues that Plaintiff cannot establish that she is entitled to punitive damages. (MSJ at 17.) Plaintiff fails to address this argument in her Response. "It is a well-settled principle that by failing to address arguments in an opposition, a party effectively concedes a claim." *Thompson v. Isagenix Int'l, LLC*, No. CV-18-04599-PHX-SPL, 2020 WL 1432840, at *4 (D. Ariz. March 24, 2020). And regardless, the Court finds that there is no evidence Defendant acted with the malice or reckless indifference required for an award of punitive damages. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 533–39 (1999). The Court therefore will grant Defendant's Motion as to punitive damages.

## IV.    CONCLUSION

Defendant fails to show that there is no genuine dispute of material fact as to Plaintiff's hostile work environment claim or her pursuit of compensatory damages. However, Defendant has shown that there is no genuine dispute of material fact, and Defendant is entitled to prevail as a matter of law, on Plaintiff's retaliation claim. Plaintiff also concedes that she cannot prove punitive damages.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendant Northern Arizona Healthcare Corporation's Motion for Summary Judgment (Docs. 69, 79). Defendant is entitled to summary judgment with respect to Plaintiff's claim for Title VII Retaliation and with respect to punitive damages. The Motion is denied in all other respects.

**IT IS FURTHER ORDERED** that this matter will proceed to trial, and the Court will set a pre-trial status conference by separate Order.

Dated this 5th day of June, 2024.

_____
Honorable John J. Tuchi
United States District Judge

cc:     Counsel for Plaintiff – Christopher Houk
        Counsel for Defendant – Bryson Buckley, Elizabeth Soveranez, Thomas Stanek